UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JOSHUA WALZ, individually and on behalf of all those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WALMART INC., et al.,<br><br>Defendants. | CASE NO. 3:23-cv-06083-BHS<br><br>ORDER |

This matter is before the Court on Defendants Walmart Inc., Delivery Drivers Inc., and Ashley Hatfield's motion to compel arbitration. Dkt. 12. Because the arbitration agreement between Walmart and Plaintiff Joshua Walz is enforceable and requires Walz's claims to be arbitrated on an individual basis, the motion is granted.

## I. BACKGROUND

In June 2021, Joshua Walz contracted with Walmart to be a delivery driver for "Spark Driver"—a mobile application owned by Walmart and which enables customers to order groceries and other merchandise from Walmart stores and have those products delivered to their residences. Dkt. 1-1, ¶¶ 4.3, 4.10, 4.11; Dkt. 13, ¶¶ 3, 5. Each product

that a customer purchases through Spark Driver is "taken off the shelf in that store and bagged for delivery" by Walmart employees before being delivered. Dkt. 21, ¶ 9.

Delivery Drivers Inc. (DDI) is the "administrator of driver management" for Spark Driver. Dkt. 1-1, ¶ 4.4. It recruits delivery drivers, conducts background checks on potential drivers, ensures that drivers have automobile insurance, and performs accounting and payroll services. *Id.*

Walz's contract with Walmart classified him as an independent contractor. Dkt. 13-2 at 2. He was required to use his own vehicle and pay for his own gasoline, tires, automobile maintenance, automobile insurance, cellphone usage, and other expenses. Dkt. 1-1, ¶ 4.13. For each delivery he completed, Walz was compensated a flat rate of pay, which was determined by an algorithm formulated by Walmart and not shared with delivery drivers. *Id.* ¶ 4.20.

Walz claims that, when drivers picked orders up from Walmart stores, Walmart employees prepared the orders and Walmart "prohibited" drivers from loading the orders into their own vehicles "unsupervised." Dkt. 1-1, ¶¶ 4.25–4.26. He alleges that Walmart also "required a specific methodology for where orders were placed in the drivers' vehicles." *Id.* ¶ 4.26. Walz asserts that Ashley Hatfield—Walmart's department manager for e-commerce at its store in Tumwater, Washington—"directed" Walz and other delivery drivers on how to pack products into their vehicles. *Id.* ¶ 4.72. He claims that Hatfield also provided him with "written guidelines" on how to interact with Walmart employees and, on certain occasions, "cancell[ed] some of . . . Walz's orders," which resulted in him not getting paid for all hours that he worked. *Id.* ¶ 4.73–4.75.

The contract between Walz and Walmart contains an arbitration agreement and class action waiver: "Any dispute between the Parties shall be brought in arbitration on an individual basis only, and not on a class, collective, mass, or representative basis, or in any other manner that sacrifices the principal advantages of individual arbitration." Dkt. 13-2 at 12. The arbitration agreement also applies to "any and all" disputes between Walz and Walmart or its employees, including any disputes related to Walz's classification as an independent contractor:

> [T]he [Federal Arbitration Act] and this Arbitration Provision shall exclusively govern the interpretation and enforcement of this Arbitration Provision, and shall apply to any and all disputes between the Parties regardless of whether brought by Walmart against Contractor or by Contractor against Walmart or any of its agents, employees, affiliates, successors, assigns, or subsidiaries (each of which are intended third party beneficiaries of this Arbitration provision), including but not limited to . . . disputes arising out of or related to Contractor's classification as an independent contractor.

Dkt. 13-2 at 10.

The contract further provides "any entity with whom Walmart or Contractor used to administer the relationship between the Parties, or facilitate payment between Walmart and Contractor . . . , is an intended third party beneficiary of this Arbitration provision." Dkt. 13-2 at 11.

Despite these arbitration provisions, the contract requires any dispute concerning the enforceability of the class action waiver to proceed in court:

> Only an arbitrator, and not any federal, state, or local court or agency, shall have the exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability, or formation of this Arbitration Provision, including without limitation any dispute concerning arbitrability. *However*, the preceding sentence *shall not* apply to any

dispute relating to or arising out of the Class Action Waiver . . . including, but not limited to, any claim that all or part of the Class Action Waiver . . . is unenforceable, unconscionable, illegal, void, or voidable.

Dkt. 13-2 at 10–11 (emphasis added).

If the court concludes that the class action waiver is unenforceable, the class action must proceed in court: "In any case in which . . . there is a final judicial determination that all or part of the Class Action Waiver . . . is invalid or unenforceable, the class . . . action to that extent must be litigated in a civil court of competent jurisdiction." *Id.* at 16–17.

Walz sued in Pierce County Superior Court on behalf of himself and all others similarly situated,[1] claiming that Walmart and DDI failed to pay the minimum wage for all hours worked, including overtime pay, accounting for necessary expenses; failed to pay all tips and gratuities given by customers; failed to provide required rest and meal periods and compensate for missed periods; and failed to provide paid sick leave. Dkt. 1-1, ¶¶ 1.1, 6.2–6.3, 7.5–7.7, 8.5–8.7, 9.2, 10.2–10.3, 11.3–11.4. Walz asserts violations of Washington's Industrial Welfare Act, chapter 49.12 RCW, Minimum Wage Act, chapter 49.46 RCW, Wage Payment Act, chapter 49.48 RCW, and Wage Rebate Act, chapter 49.52 RCW. *Id.* ¶¶ 6.1–11.5. He seeks damages for unpaid wages, exemplary damages, and attorney fees and costs. *Id.* at 20–21.

---

[1] The complaint defines the putative class as "[a]ll individuals currently or formerly contracted directly by Defendants to provide delivery services to Walmart in Washington at any time since October 23, 2020, and paid in whole or in part on a piecework commission, or other productivity basis." Dkt. 1-1, ¶ 5.1.

ORDER - 4

Walmart removed to this Court under the Class Action Fairness Act. Dkt. 1 at 1, 13, 14 (citing 28 U.S.C. §§ 1332(d), 1441(a), 1446, 1453). Walmart and Hatfield move to compel this matter to arbitration, asserting that the Federal Arbitration Act (FAA), 9 U.S.C. § 1, et seq., governs the arbitration agreement between Walz and Walmart and that the agreement requires any claim related to Walz's classification as an independent contractor to be arbitrated. Dkt. 12 at 6–7. They contend that Hatfield and DDI are third-party beneficiaries of the agreement, so Walz's claims against those defendants must also be arbitrated. *Id.* at 8 n.3, 9.

Walz does not dispute that Hatfield and DDI are third-party beneficiaries of the agreement. *See generally* Dkt. 18. He also does not dispute that the plain terms of the arbitration agreement encompass claims concerning his classification as an independent contractor. *See generally id.*

He nevertheless opposes arbitration, asserting that the agreement is exempt from the FAA under 9 U.S.C. § 1 because he worked as a transportation worker engaged in interstate commerce. Dkt. 18 at 8–18; *see* 9 U.S.C. § 1 ("Nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."). He contends that, because the FAA does not apply to the arbitration agreement, "state law controls whether this case should be arbitrated." *Id.* at 18. He argues that, under Washington law, the agreement's class action waiver is substantively unconscionable and that the agreement's own terms require the class action to remain in this Court. *Id.* at 19, 21 (citing Dkt. 13-2 at 16–17).

The issues are addressed in turn.

## II.  DISCUSSION

**A.    The contract between Walz and Walmart is not exempt from the FAA.**

Walz contends that the FAA does not apply to his contract with Walmart. Dkt. 18 at 6. He asserts that Spark Driver delivery drivers are transportation workers engaged in interstate commerce, which are exempt from the FAA's requirements under 9 U.S.C. § 1. *Id.* Walz claims this is so because he and other Spark Driver workers "deliver goods travelling through the chain of interstate commerce to consumers." *Id.*

Walmart and Hatfield disagree. They argue that, to qualify for § 1's exemption, a transportation worker must "'play[] a direct and necessary role in the free flow of goods across borders' or [be] 'actively engaged in transportation of those goods across borders via the channels of foreign or interstate commerce.'" Dkt. 12 at 13 n.6 (internal quotation marks omitted) (quoting *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022)). They contend that "Walz's activities—making local deliveries of groceries and merchandise purchased by local Washington residents from Washington-based Walmart stores—clearly do not meet this threshold." *Id.* They invite the Court to "distinguish[] between workers who transport goods which are continuing in one uninterrupted interstate journey as part of a single transaction, and those goods which may travel interstate to get to a local location and are then purchased by customers and delivered by a driver locally in a separate transaction." *Id.* at 12–13.

The FAA exempts from its ambit employment contracts of transportation workers engaged in interstate commerce: "[N]othing herein contained shall apply to contracts of

employment of seamen, railroad employees, or any other class of workers[2] engaged in foreign or interstate commerce." 9 U.S.C. § 1. Whether § 1's exemption applies is an issue for courts, not arbitrators. *New Prime Inc. v. Oliveira*, 586 U.S. 105, 111 (2019) ("[A] court should decide for itself whether § 1's 'contracts of employment' exclusion applies before ordering arbitration.").

The term "contracts of employment" in § 1 includes "not only agreements between employers and employees but also agreements that require independent contractors to perform work." *New Prime*, 586 U.S. at 114. The Supreme Court has nevertheless cautioned that "the § 1 exclusion provision be afforded a narrow construction." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001). The exemption accordingly applies to "only contracts with transportation workers" who "play a direct and 'necessary role in the free flow of goods' across borders." *Saxon*, 596 U.S. at 458 (quoting *Circuit City*, 532 U.S. at 121 (2001)). "Put another way, transportation workers must be actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce." *Saxon*, 596 U.S. at 458 (quoting *Circuit City*, 532 U.S. at 121).

The Ninth Circuit has held that drivers who work on the ride-share service Uber do not qualify as transportation workers under § 1: "[W]e join the growing majority of courts holding that Uber drivers as a class of workers do not fall within the 'interstate commerce' exemption from the FAA." *Capriole v. Uber Technologies, Inc.*, 7 F.4th 854,

---

[2] The term "class" in this statute refers broadly to the "class of workers" to which the relevant party belongs. 9 U.S.C. § 1. It is not strictly limited to how a plaintiff defines the putative "class" in a class action complaint.

ORDER - 7

861 (9th Cir. 2021). The court explained that, although it was "not presented with the question of whether drivers for app-based food delivery services *or other local courier services* fall under the interstate commerce exemption, . . . [its] precedent, along with that of at least one other circuit, *suggests that such workers similarly do not fall under the exemption*." *Id.* at 854 at n.7 (citing *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 916 (9th Cir. 2020); *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 802–803 (7th Cir. 2020) (Barrett, J.)).

To-date, at least two federal circuits have held that drivers on courier platforms such as Postmates or Grubhub who deliver to local customers food from local restaurants or goods from local convenience stores do not qualify for § 1's exemption. *See Immediato v. Postmates, Inc.*, 54 F.4th 67, 80, 82 (1st Cir. 2022); *Wallace*, 970 F.3d at 803 (Barrett, J.). In *Immediato*, the First Circuit explained that "[a]lthough [Postmates delivery drivers] transport goods, qua couriers, they do so as part of *separate intrastate transactions* that are not themselves within interstate commerce." 54 F.4th at 78 (emphasis added). It does not matter "[t]hat the delivered items may have once travelled across state borders" because "[t]he interstate journey terminates when the goods arrive at the local restaurants and retailers to which they are shipped." *Id.* Only after the interstate transactions are completed do "[c]ustomers . . . purchase those meals and goods from local businesses." *Id.* "Thus, when the couriers set out to deliver customer orders, they do so as part of *entirely new and separate transactions*." *Id.* (emphasis added).

Walz fails to distinguish two separate and distinct categories of transactions in which Walmart is involved. The first category encompasses transactions between

Walmart and its suppliers. These transactions presumably are interstate in nature: as Walz alleges, "[a] vast majority of the products and goods" sold at Walmart stores "were produced, manufactured, and/or distributed from outside of Washington." Dkt. 1-1, ¶ 4.12. Walz was not involved in these transactions.

The second category, by contrast, encompasses transactions between local Walmart customers and their local Walmart stores. As a delivery driver, Walz was involved in only these transactions. Unlike the transactions between Walmart and its suppliers, these transactions are intrastate in nature: local Walmart customers may order products on the Spark Driver application from their local Walmart stores, and drivers like Walz pick up those products and deliver them to the customers' residences.

Walz asserts that "Plaintiff and members of the putative class engaged in interstate commerce by transporting goods that originated from outside Washington and delivering them to their final destination, the consumer, thus completing the interstate commercial transaction." Dkt. 18 at 7. Walz misses the point. The only interstate transactions remotely relevant to this case—those between Walmart and its suppliers—ended when the suppliers delivered out-of-state goods to local Walmart stores. *See Immediato* 54 F.4th at 78 ("The interstate journey terminates when the goods arrive at the local restaurants and retailers to which they are shipped."). Walz did not transport goods as a part of those transactions.

It is of no consequence that Walz—as part of separate and distinct transactions between local Walmart customers and local Walmart stores—delivered products that once travelled in interstate commerce. In *Wallace*, then-Judge Amy Coney Barrett

rejected virtually the same argument made by Grubhub[3] delivery drivers, explaining that it strains the meaning of transportation workers who perform work analogous to that of seamen and railroad employees:

> Rather than focusing on whether they belong to a class of workers actively engaged in the movement of goods across interstate lines, the plaintiffs stress that they carry goods that have moved across state and even national lines. A package of potato chips, for instance, may travel across several states before landing in a meal prepared by a local restaurant and delivered by a Grubhub driver; likewise, a piece of dessert chocolate may have traveled all the way from Switzerland. The plaintiffs insist that delivering such goods brings their contracts with Grubhub within § 1 of the FAA. As they see it, the residual exemption is not so much about what the worker does as about where the goods have been.
>
> But to fall within the exemption, the workers must be connected not simply to the goods, but to the act of moving those goods across state or national borders. Put differently, a class of workers must themselves be "engaged *in the channels* of foreign or interstate commerce." *McWilliams v. Logicon, Inc.*, 143 F.3d 573, 576 (10th Cir. 1998) (emphasis added). That, after all, is what it means to be a transportation worker who performs work analogous to that of seamen and railroad employees, whose occupations are centered on the transport of goods in interstate or foreign commerce. By erasing that requirement from the statute, the plaintiffs' interpretation would sweep in numerous categories of workers whose occupations have nothing to do with interstate transport—for example, dry cleaners who deliver pressed shirts manufactured in Taiwan and ice cream truck drivers selling treats made with milk from an out-of-state dairy. That result would run afoul of the [Supreme] Court's instruction that the scope of the residual clause "be controlled and defined" by the work done by seamen and railroad workers, *Circuit City*, 532 U.S. at 106, 121 S.Ct. 1302, not to mention its admonition that § 1 as a whole must be "afforded a narrow construction." *Id.* at 118, 121 S.Ct. 1302.

---

[3] Grubhub is "an online and mobile food-ordering and delivery marketplace." *Wallace*, 970 F.3d at 799 (internal quotation marks omitted). Like Spark Driver, which enables customers to order products from local Walmart stores and have those products delivered to their residences, Grubhub "provides a platform for diners to order takeout from local restaurants, either online or via its mobile app" and, [o]nce the food is ready, the diner can . . . request that Grubhub dispatch a driver to deliver it." *Id.*

*Wallace*, 970 F.3d at 802 (Barrett, J.). Walz strains the meaning of "transportation worker" in the same way.

Walz cites *Saxon*, 596 U.S. 450, in support of his argument. *Saxon* concerned a class-action plaintiff who worked as "a ramp supervisor for Southwest [Airlines] at Chicago Midway International Airport" and whose "work frequently require[d] her to load and unload baggage, airmail, and commercial cargo on and off airplanes that travel across the country." *Id.* at 453, 454. The Supreme Court held that the plaintiff was a transportation worker under § 1. *Id.* at 457. It explained that "one who loads cargo on a plane bound for interstate transit is intimately involved with the commerce (*e.g.*, transportation) of that cargo" and "'[t]here could be no doubt that [interstate] transportation [is] still in progress,' and that a worker is engaged in that transportation, when she is 'doing the work of unloading' or loading cargo from a vehicle carrying goods in interstate transit." *Id.* at 458–59 (first alteration added) (quoting *Erie R. Co. v. Shuart*, 250 U.S. 465, 468 (1919)). In other words, *Saxon* concerned a class of workers defined by its "direct and necessary role" in interstate transactions. 589 U.S. at 458 (internal quotation marks omitted) (quoting *Circuit City*, 532 U.S. at 121). Walz does not belong to such a class.

Walz also cites *Rittmann*, 971 F.3d 904, 907, which concerned a class of delivery workers who contracted with Amazon "to make 'last mile' deliveries of products from Amazon warehouses to the products' destinations using the AmFlex[4] smart phone

---

[4] "AmFlex stands for "Amazon Flex." *Rittmann*, 971 F.3d at 907.

1  application." This application allows workers to "use a personal vehicle or bicycle, or

2  public transportation, to deliver products ordered through the Amazon website or mobile

3  applications." *Id.* Although "AmFlex delivery providers occasionally cross state lines to

4  make deliveries, . . . most of their deliveries take place intrastate." *Id.*

5        Significantly, the goods delivered by AmFlex workers are purchased by local

6  customers via Amazon's website or applications from either Amazon itself or "third-

7  party sellers who also sell their products on Amazon.com." *Rittmann*, 971 F.3d at 907.

8  The AmFlex delivery providers form the final step of the supply chain for these interstate

9  transactions: they "pick up packages that have been distributed to Amazon warehouses,"

10 and which have "certainly [crossed] state lines, and transport them for the last leg of the

11 shipment to their destinations." *Id.* at 915. In this sense, "the Amazon packages they carry

12 are goods that remain in the stream of interstate commerce *until they are delivered*" to the

13 customer who ordered them. *Id.* (emphasis added). AmFlex workers accordingly play a

14 direct and necessary role in interstate transactions.

15       Spark Driver delivery drivers do not. As another court in this Circuit has

16 recognized: "[U]nlike the 'Amazon Flex drivers,' Spark drivers are not completing the

17 last leg of a single, unbroken trip and transaction from an out-of-state manufacturer, to a

18 fulfillment center, then to the customer who ordered the goods. Rather, Spark drivers

19 transport local merchandise to local customers." *Shelton v. Delivery Drivers, Inc.*, No.

20 8:22-CV-02135-DOC, 2023 WL 2629027, at *3 (C.D. Cal. Jan. 31, 2023) (citing

21 *Capriole*, 7 F.4th at 863–64). Such intrastate transactions between Walmart and its

22

consumers are separate and distinct from the interstate transactions between Walmart and its suppliers.

Finally, the complaint alleges that, "[a]t times, Plaintiff and members of the putative class got delivery orders that cross state borders." Dkt. 1-1, ¶ 4.17. Walz's response brief does not acknowledge this allegation, *see generally* Dkt. 18, and the complaint does not contain any specific factual allegations explaining how often Walz or other Spark Driver workers crossed state lines when delivering goods. *See generally* Dkt. 1-1.

In any event, the fact that Walz and some other Spark Driver workers may have occasionally delivered products across state lines makes no difference. "[I]n determining whether the [§ 1] exemption applies, the question is 'not whether the *individual worker* actually engaged in interstate commerce, but whether *the class of workers to which the complaining worker belonged* engaged in interstate commerce.'" *Wallace*, 970 F.3d at 800 (Barrett, J.) (quoting *Bacashihua v. U.S. Postal Service*, 859 F.2d 402, 405 (6th Cir. 1988)). "That means that a member of the class qualifies for the exemption even if she does not personally 'engage in interstate commerce.'" *Wallace*, 970 F.3d at 800 (Barrett, J.) (quoting *Bacashihua*, 859 F.3d at 405). "By the same token," however, "someone whose occupation is not *defined* by its engagement in interstate commerce does not qualify for the exemption just because she *occasionally* performs that kind of work." *Wallace*, 970 F.3d at 800 (Barrett, J.) (emphasis added) (citing *Hill v. Rent-A-Center*, 398

F.3d 1286, 1289–90 (11th Cir. 2005)). For example, "Lyft[5] drivers, as a class, are not engaged in interstate commerce" because "[t]heir work predominantly entails intrastate trips" even if "some drivers (especially those who live near state borders) regularly transport passengers across state lines." *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 916 (N.D. Cal. 2020), *aff'd*, No. 20-15689, 2022 WL 474166 (9th Cir. Feb. 16, 2022).

At most, Walz plausibly alleges that he and some other Spark Driver workers have only occasionally delivered products across state lines. This does not demonstrate that he belongs to a class of transportation workers that is defined by its engagement in interstate commerce. *See Wallace*, 970 F.3d at 800; *Rogers*, 452 F. Supp. 3d at 916. Walz accordingly fails to establish that his contract with Walmart is exempt from the FAA under § 1.[6]

**B.  The arbitration agreement's class action waiver is enforceable under federal law.**

Walz argues that the arbitration agreement's class action waiver is unconscionable under Washington law. Dkt. 18 at 18. As a result, he contends, the agreement's own terms require the class action to proceed in court. *Id.* at 21. Walmart and Hatfield do not reply to this argument. *See generally* Dkt. 20. They instead reiterate that the FAA's

---

[5] Lyft, like Uber, is a mobile application that provides ride-share services.

[6] Walz alternatively asserts that "additional discovery is needed to confirm the direct and necessary role Plaintiff and members of the putative class played in the continuous free flow of goods." Dkt. 18 at 17. The Court disagrees. The record is sufficiently developed for the Court to conclude that Walz and other Spark Driver delivery drivers are not transportation workers engaged in interstate commerce under § 1.

transportation worker exemption does not apply to Walz's contract with Walmart. *Id.* at 2–3.

The contract between Walz and Walmart contains the following class action waiver: "**CLASS AND REPRESENTATIVE ACTION WAIVERS:** Any dispute between the Parties shall be brought in arbitration on an individual basis only, and not on a class, collective, mass, or representative basis, or in any other manner that sacrifices the principal advantages of individual arbitration." Dkt. 13-2 at 12.

The contract further provides that a court, not an arbitrator, must resolve any dispute concerning the enforceability of this waiver:

> [A]ny dispute relating to arising out of the Class Action Waiver . . . including, but not limited to, any claim that all or part of the Class Action Waiver . . . is unenforceable, unconscionable, illegal, void, or voidable . . . must proceed in a court of competent jurisdiction and cannot be heard or arbitrated by an arbitrator.

Dkt. 13-2 at 11.

To the extent the class action waiver is deemed unenforceable, the class action must proceed in court and the matter cannot be compelled to arbitration:

> In any case in which (1) the dispute is filed as a class . . . action, and (2) there is a final judicial determination that all or part of the Class Action Waiver . . . is invalid or unenforceable, the class . . . action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Class Action Waiver . . . that is valid and enforceable shall be enforced in arbitration.

Dkt. 13-2 at 16–17.

In support of his unconscionability defense, Walz cites a decision of the Washington Court of Appeals, *Oakley v. Domino's Pizza LLC*, 23 Wn. App. 2d 218

(2022). Dkt. 18 at 19. In that case, the court held that—under Washington law—an arbitration agreement's class action waiver in a wage and hour case was substantively unconscionable, reasoning that the waiver "frustrate[d] [the] state's public policy of protecting workers' rights to undertake collective actions and ensure the proper payment of wages." *Oakley*, 23 Wn. App. 2d at 235. The court reasoned that, "'[w]hen wrongs are small but widespread, class actions are often the only effective way to address them'" and "'an arbitration agreement may be substantively unconscionable when it is used as a tool of oppression to prevent vindication of small but widespread claims.'" *Id.* at 233 (quoting *McKee v. AT & T Corp.*, 164 Wn.2d 372, 395, 397 (2008)). Although "the record [did] not establish how extensive [the named plaintiff]'s damages were, . . . it [did] indicate that he would not have been able to pay a lawyer to bring the suit on an individual basis." *Oakley*, 23 Wn. App. 2d at 234.

Unlike Walz, however, the named plaintiff in *Oakley* was a transportation worker under 9 U.S.C. § 1 and his employment contract was accordingly exempt from the FAA's requirements. *See id.* at 230. Walz appears to concede that the unconscionability defense announced in *Oakley* is inapplicable when a contract of employment is subject to the FAA, although he does not expressly say so. *See* Dkt. 18 at 18 (arguing that, "[b]ecause Plaintiff is an exempt transportation worker under the meaning of the FAA, state law controls whether this case should be arbitrated.").

Under the FAA, agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of *any* contract." 9 U.S.C. § 2 (emphasis added). "In this way the clause establishes a sort of 'equal-

treatment' rule for arbitration contracts," permitting "'agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 507 (2018) (internal quotation marks omitted) (quoting *Kindred Nursing Centers L.P. v. Clark*, 581 U.S. 246, 251 (2017)); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)).

However, "nothing" in § 2's saving clause "suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives." *Concepcion*, 563 U.S. at 343. The clause accordingly "offers no refuge for 'defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'" *Lewis*, 584 U.S. at 507–508 (quoting *Concepcion*, 563 U.S. at 339). This includes "defenses that . . . 'interfer[e] with fundamental attributes of arbitration.'" *Lewis*, 584 U.S. at 508 (quoting *Concepcion*, 563 U.S. at 344). In *Conception*, for example, the Supreme Court held that § 2 preempted a California rule that classified most collective-arbitration waivers in consumer contracts as unconscionable. 563 U.S. at 340, 352.

According to the Supreme Court, arbitration proceedings are "traditionally individualized and informal [in] nature." *Lewis*, 584 U.S. at 508. The Supreme Court has explained that a state law defense "permitting any party in arbitration to demand classwide proceedings" would "'fundamental[ly]' change . . . the traditional arbitration process" by "'sacrific[ing] the principal advantage of arbitration—its informality—and mak[ing] the process slower, more costly, and more likely to generate procedural morass than final judgment.'" *Id.* (quoting *Conception*, 563 U.S. at 338).

Because the FAA applies to the contract between Walz and Walmart, the Court is bound by Supreme Court precedent defining the scope of § 2's saving clause. Under this precedent, the contract's class action waiver is not unconscionable, *see Lewis*, 584 U.S. at 508–509; *Conception*, 563 U.S. at 352, and the state-law unconscionability defense announced in *Oakley*, 23 Wn. App. 2d 218, is inapplicable.

### III.  ORDER

Therefore, it is hereby **ORDERED** that Defendants' motion to compel arbitration, Dkt. 12, is **GRANTED**. This proceeding is **STAYED** pending the parties' arbitration. The parties shall promptly notify the Court of any relevant developments resulting from the arbitration.

Dated this 6th day of June, 2024.

BENJAMIN H. SETTLE
United States District Judge